**LASTER/GREENBERG P.C.**
By:     Kenneth S. Goodkind, Esquire
         Adam E. Gersh, Esquire
Commerce Center
1810 Chapel Avenue West
Cherry Hill, NJ 08002-4609
Telephone:  (856) 661-1900
Attorneys for Defendants Jason M. Wolf and Wolf Commercial Real Estate

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LANARD & AXILBUND, LLC d/b/a COLLIERS INTERNATIONAL, <br><br> Plaintiff, <br><br> v. <br><br> JASON M. WOLF and WOLF COMMERCIAL REAL ESTATE, <br><br> Defendants. | **Civil Action No. 2:14-cv-00234-PBT** <br><br> **Document Electronically Filed** |

## DECLARATION OF JASON M. WOLF

I, Jason M. Wolf, of full age, do hereby certify as follows:

1.     I am an individual Defendant in the above-referenced matter and the sole member of Defendant Wolf Commercial Real Estate (collectively, "Defendants").

2.     As such, I have personal knowledge of the facts set forth herein.

3.     I reside at 156 Renaissance Drive, Cherry Hill, New Jersey 08003 and I have a business address of 8001 Lincoln Drive West Marlton, NJ 08053.

4.     Wolf Commercial Real Estate has its corporate headquarters, central office and principal place of business at 8001 Lincoln Drive West Marlton, NJ 08053.

5.      Defendants are not citizens of the Commonwealth of Pennsylvania.

6.      In or about 1995, I joined Plaintiff as a sales representative.

7.      On or about August 1, 1998, Plaintiff required that I sign an "Independent Contractor Agreement." (Complaint at Exhibit A, Docket Entry No. 1).

8.      Pursuant to the Independent Contractor Agreement, I was required to "perform such duties on behalf of [Plaintiff] as are customarily performed by salespeople or brokers in the commercial real estate field." (Id.)

9.      Specifically, I was assigned to perform commercial real estate salesperson duties for the "office" market in Southern New Jersey for Defendants.

10.     On or about December 16, 2010 (but retroactively effective to January 1, 2010), Plaintiff promoted me to become a member of Plaintiff.

11.     Pursuant to a purchase agreement, I purchased a two percent (2%) membership interest in Plaintiff for Ninety One Thousand Five Hundred Ninety Dollars ($91,590) and became a member of Plaintiff, executing the Operating Agreement and Related Membership Documents ("Operating Agreement"). A true and correct copy of the Operating Agreement and Related Membership Documents is attached hereto as Exhibit A.

12.     Throughout the course of my relationship with Plaintiff as a salesperson, independent contractor, and Member, my sales territory was limited to Southern New Jersey.

13.     Moreover, to the extent that Plaintiff bases its factual allegations on my contacts with Evan Zweben, Plaintiff's employee, Zweben is employed in Plaintiff's Southern New Jersey office and does not conduct business in this judicial district.

I declare under penalty of perjury that the foregoing is true and correct, subject to the penalties of 28 U.S.C. §1746.

-2-

Executed on this _____ January, 2014.

By: _____   01/21/2014

Jason M. Wolf

# EXHIBIT A
# TO CERTIFICATION
# OF JASON M. WOLF

# LANARD & AXILBUND, LLC

## AMENDED & RESTATED OPERATING AGREEMENT

## and

## MEMBERSHIP DOCUMENTS

(LAST UPDATED 5.31.2011)

Wolf Copy

# LANARD & AXILBUND, LLC

## Operating Agreement and Related Membership Documents
## (last revised May 31, 2011)

I   **Amended and Restated Limited Liability Company Operating Agreement Dated July 30, 2010, but intended to be effective January 1, 2010, by and among Lanard & Axilbund, Inc., Douglas R. Sayer and Robert B. Steinhart**

A.   First Amendment to the Limited Liability Company Operating Agreement dated July 30, 2010, but intended to be effective January 1, 2010, by and among Lanard & Axilbund, Inc., Douglas R. Sayer, Robert B. Steinhart, Marc R. Isdaner and Michael Barmash

B.   Joinder to Limited Liability Company Operating Agreement dated July 30, 2010, but intended to be effective January 1, 2010 by Marc R. Isdaner

C.   Joinder to Limited Liability Company Operating Agreement dated July 30, 2010, but intended to be effective January 1, 2010 by Michael Barmash

D.   Second Amendment to the Limited Liability Company Operating Agreement dated December 14, 2010, but intended to be effective January 1, 2010, by and among Lanard & Axilbund, Inc., Douglas R. Sayer, Robert B. Steinhart, Marc R. Isdaner, Michael Barmash and Mark Chubb

E.   Joinder to Limited Liability Company Operating Agreement dated December 10, 2010, but intended to be effective January 1, 2010 by Mark Chubb

F.   Third Amendment to the Limited Liability Company Operating Agreement dated December 16, 2010, but intended to be effective January 1, 2010, by and among Lanard & Axilbund, Inc., Douglas R. Sayer, Robert B. Steinhart, Marc R. Isdaner, Michael Barmash, Mark Chubb and Michael Zerbe

G.   Joinder to Limited Liability Company Operating Agreement dated December 16, 2010, but intended to be effective January 1, 2010 by Michael Zerbe

H.   Fourth Amendment to the Limited Liability Company Agreement dated December 16, 2010, but intended to be effective January 1, 2010, by and among Lanard & Axilbund, Inc., Douglas R. Sayer, Robert B. Steinhart, Marc R. Isdaner, Michael Barmash, Mark Chubb, Michael Zerbe and Jason Wolf

I.   Joinder to Limited Liability Company Operating Agreement dated December 16, 2010, but intended to be effective January 1, 2010 by Jason Wolf

II  **Membership Documents specific to Jason Wolf**

A.   Agreement to Purchase Class B Membership Interest dated December 16, 2010, by and between Lanard & Axilbund, LLC and Jason Wolf

1

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY

OPERATING AGREEMENT

OF

LANARD & AXILBUND, LLC

A Pennsylvania Limited Liability Company

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................ 2

    1.1.   Definitions ................................................................................ 2

    1.2.   Construction ............................................................................. 5

ARTICLE II ORGANIZATION ......................................................................... 5

    2.1.   Formation ................................................................................ 5

    2.2.   Name ...................................................................................... 5

    2.3.   Registered Office; Principal Office; Other Offices ..................... 5

    2.4.   Purpose ................................................................................... 6

    2.5.   Taxation, No State Law Partnership ......................................... 6

    2.6.   Foreign Qualification .............................................................. 6

    2.7.   Term and Fiscal Year .............................................................. 6

    2.8    Colliers International Affiliation Agreement ............................. 6

ARTICLE III MANAGEMENT .......................................................................... 7

    3.1.   Management by Managing Member; Exclusive Responsibility .... 7

    3.2.   Non-Exclusive Service ............................................................ 7

    3.3.   Term of Managing Member ...................................................... 7

    3.4.   Conduct of Company Affairs by the Managing Member ............ 7

    3.5.   Binding Effect of Actions ........................................................ 8

    3.6.   Business Transactions ............................................................. 8

    3.7.   Removal; Substitute Managing Member .................................... 8

    3.8.   Limitation of Liability ............................................................. 9

    3.9.   Reports ................................................................................... 9

i

Wolf Copy

B.   Copy of Secured Promissory Note dated December 16, 2010, in the original principal amount of $18,318.00 by Jason Wolf in favor of Lanard & Axilbund, LLC

C.   Copy of Secured Promissory Note dated December 16, 2010, in the original principal amount of $73,272.00 by Jason Wolf in favor of Lanard & Axilbund, LLC

D.   Pledge Agreement dated December 16, 2010, by Jason Wolf in favor of Lanard & Axilbund, LLC

ARTICLE IV MEMBERS AND MEMBERSHIP INTERESTS ......................................... 10

    4.1.    Members. ........................................................................... 10

    4.2.    Record Holders of Membership Interests. ......................... 10

    4.3.    Class A Members. ............................................................. 10

    4.4.    Class B Members. ............................................................. 10

    4.5.    Admission of Interest Holders as Members. ..................... 12

    4.6.    Capital Account of Transferee. ......................................... 13

    4.7.    Lack of Authority. ............................................................ 13

    4.8.    Status of Membership Interest. ......................................... 13

    4.9.    No Appraisal Rights. ......................................................... 13

    4.10.   Annual Meetings; Special Meetings. ................................ 13

    4.11.   Place of Meetings. ............................................................ 14

    4.12.   Notice of Meetings. .......................................................... 14

    4.13.   Voting by Members. ......................................................... 14

    4.14.   Quorum of and Action by Members. ................................ 14

    4.15.   Action Without a Meeting; Telephone Meetings. ............. 15

    4.16.   Dissociation. .................................................................... 15

ARTICLE V FINANCIAL AND TAX MATTERS ......................................................... 16

    5.1.    Capital Contributions. ...................................................... 16

    5.2.    Return of Capital. ............................................................. 16

    5.3.    Capital Accounts. ............................................................. 16

    5.4.    Profits and Losses. ........................................................... 17

    5.5.    Distributions. .................................................................... 18

    5.6.    Special Allocations. .......................................................... 18

    5.7.    Establishment of Reserves. .............................................. 19

5.8.    Filing of Tax Returns. ................................................................ 19

5.9.    Tax and Financial Reports. ....................................................... 19

5.10.   Section 754 Election. ................................................................. 19

ARTICLE VI LIABILITIES; INDEMNIFICATION; MEMBER TRANSACTIONS ............... 20

6.1.    Indemnification of a Member. ................................................... 20

6.2.    Payment of Expenses. ............................................................... 20

6.3.    Assumption of Personal Liability. ............................................. 20

6.4.    Member Transactions ................................................................ 20

ARTICLE VII CONFIDENTIALITY; NON-DISCLOSURE; NON-COMPETITION AND
NON-SOLICITATION ............................................................................................. 22

7.1.    Members' Confidentiality Obligation. ....................................... 22

7.2.    Property. ................................................................................... 22

7.3.    Non-Competition and Non-Solicitation. .................................... 22

7.4.    Injunctive Relief. ..................................................................... 23

7.5.    Saving Clause. .......................................................................... 23

7.6.    Definition of "Client." .............................................................. 23

7.7.    Survival of Terms. .................................................................... 24

ARTICLE VIII ASSIGNMENT OF INTERESTS ................................................... 24

8.1.    Restrictions on Transfer. .......................................................... 24

8.2.    Effect of Prohibited Transfer by Member. ................................ 24

8.3.    Admission of Interest Holders as Members; Re-Classification. ............................ 25

8.4.    Capital Account of Transferee. ................................................. 25

8.5.    Voluntary Transfer. .................................................................. 25

8.6.    Put Option. ............................................................................... 27

8.7.    Purchase Price and Terms. ....................................................... 28

8.8.    Control Offer. ........................................................................... 30

| 8.9. | Death. | 30 |
| 8.10. | Permanent Disability. | 30 |
| 8.11. | Mandatory Offers. | 30 |
| ARTICLE IX TERM, DISSOLUTION, LIQUIDATION AND TERMINATION | | 31 |
| 9.1. | Dissolution. | 31 |
| 9.2. | Liquidation and Termination. | 32 |
| 9.3. | Order of Dissolution. | 33 |
| 9.4. | Protected Parties. | 34 |
| ARTICLE X GENERAL PROVISIONS. | | 34 |
| 10.1. | Offset. | 34 |
| 10.2. | Notices. | 34 |
| 10.3. | Entire Agreement. | 34 |
| 10.4. | Effect of Waiver or Consent. | 34 |
| 10.5. | Amendment or Modification. | 35 |
| 10.6. | Binding Act. | 35 |
| 10.7. | Governing Law; Severability. | 35 |
| 10.8. | Further Assurances. | 35 |
| 10.9. | No Third Party Benefit. | 35 |
| 10.10. | Waiver of Certain Rights. | 35 |
| 10.11. | Counterparts. | 36 |
| 10.12. | Arbitration. | 36 |
| 10.13. | Specific Performance. | 36 |
| 10.14. | No Partition. | 37 |
| 10.15. | Headings and Captions. | 37 |
| CLASS B MEMBERSHIP INTEREST PURCHASE PRICE CALCULATION ILLUSTRATION | | 42 |

LLC Agreement 7.1.10 (2)-v7

### AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY
### OPERATING AGREEMENT
#### of
### LANARD & AXILBUND, LLC
#### A Pennsylvania Limited Liability Company

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") is entered into as of the 1st day of January, 2010 (the "Effective Date"), between DOUGLAS R. SAYER, an individual ("DRS"), ROBERT B. STEINHART, an individual ("RBS"), LANARD & AXILBUND, INC., a Pennsylvania corporation ("L&A") and those individuals signing this Agreement as Class B Members (individually a "Class B Member: and collectively Class B Members"). DRS, RBS, and L&A may hereinafter be referred to individually as an "Initial Member" and together as the "Initial Members."

#### Background

WHEREAS, prior to the execution of this Agreement, the Initial Members formed a limited liability company (the "Company") pursuant to the Pennsylvania Limited Liability Company Act, 15 P.S. §8901, et seq.; and

WHEREAS, the name of the Company is "Lanard & Axilbund, LLC," which has a principal place of business located at 399 Market Street, 3rd Floor, Philadelphia, Pennsylvania, 19106; and

WHEREAS, the Initial Members executed that certain Limited Liability Company Operating Agreement of Lanard & Axilbund, LLC dated January 1, 2005 (the "2005 Agreement"), which set forth the agreement of the Initial Members and Richard L. Soloff with respect to the governance of the Company and the transfer of interests in the Company;

WHEREAS, effective as of January 1, 2010, Richard L. Soloff's Class B Membership Interests were purchased by the Company;

WHEREAS, effective as of January 1, 2010, L&A's Class B Membership Interests were converted into Class A Membership Interests;

WHEREAS, the Initial Members intend and desire that this Agreement supersede, amend and restate the 2005 Agreement in its entirety, and all prior agreements, oral or written, between them in connection with the Company, under the laws of the Commonwealth of Pennsylvania.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the parties hereto, intending to be legally bound hereby, agree as follows:

# ARTICLE I
# DEFINITIONS

*1.1.*    *Definitions.*

As used in this Agreement, the following terms shall have the following meanings:

*"Act"* means the Pennsylvania Limited Liability Company Law of 1994, 15 Pa.C.S. §8901 et seq., and any successor statute, as amended from time to time.

*"Affiliate"* shall mean, when used with reference to a specific person or entity, a person or entity which meets any one of the following conditions: (a) any person or entity, directly or indirectly controlled by or under common control with another person or entity; (b) any person or entity owning or controlling five percent (5%) or more of the outstanding voting or equity interests of such other person or entity (other than a public company); (c) any officer, director, partner or member of such person or entity; or (d) if such other person is an officer, director, partner or member, or owner of five percent (5%) or more of the voting or equity interest of an entity (other than a public company), any entity for which such person acts in such capacity.

*"Agreement"* means this Amended and Restated Limited Liability Company Operating Agreement.

*"Bankrupt"* means, with respect to any Person, a Person (a) that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Person a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Person or of all or any substantial part of the Person's properties; or (b) against which, a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Person's consent or acquiescence, a trustee, receiver, or liquidator of the Person or of all or any substantial part of the Person's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

*"Capital Account"* means the account to be established and maintained by the Company for each Member in accordance with Section 5.3.

*"Capital Contribution"* means with respect to any Member the total amount of cash, or the value of any property (other than money) contributed by the Member and accepted by the Company to the capital of the Company, offset by the amount of debt and other liabilities

LLC Agreement 7.1.10 (2)-v7

of such Member which the Company has assumed or taken subject to, in connection with such contribution, as shown on Schedule A attached hereto. In the case of a Member that acquires Membership Interests by an assignment or Transfer in accordance with the terms of this Agreement, "Capital Contribution" means the Capital Contribution of that Member's predecessor proportionate to the acquired Interests. Any reference in this Agreement to the Capital Contribution of a then Member shall include the Capital Contribution made by any prior holder of the Membership Interest of such Member.

"*Cause*" shall mean (i) a Member's willful and continued insubordination or failure or refusal to perform his, her or its duties hereunder or under any employment agreement or independent contractor agreement between the Company and the Member (other than as a result of an individual's total or partial incapacity due to a physical or mental illness), after notice by the Company specifically identifying the offending conduct; provided, that no such conduct shall be considered "willful" if done in a good faith belief that it is in the best interests of the Company, (ii) dishonesty in the performance of a Member's duties hereunder or under any employment agreement or independent contractor agreement between the Company and the Member, (iii) a Member's breach of any provision of this Agreement, as amended, (iv) a Member's subjection to a judgment, decree or final order of a judicial or administrative body of competent jurisdiction effectively preventing such Member from the substantial performance of his, her or its duties hereunder or causing substantial damage to the Company or to its business reputation, or (v) a Member's conviction for the commission of a felony or a crime involving moral turpitude which, in the reasonable judgment of the Company's Managing Member, renders such Member unfit to continue his, her or its responsibilities as herein described or causes substantial damage to the Company or to its business reputation.

"*Certificate*" has the meaning given that term in Section 2.1.

"*Class A Member*" shall mean any Person who owns Class A Membership Interests, regardless of whether such Person also owns Class B Membership Interests. All provisions of this Agreement shall continue to apply to Class A Members and Class A Membership Interests regardless of whether such Person also owns any other class of interests.

"*Code*" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder, or any successor statute, as the same may be amended from time to time. A reference to a section of the Code shall be deemed to include any amendatory or successor provisions thereto.

"*Company*" means Lanard & Axilbund, LLC, a Pennsylvania limited liability company.

"*Contract Salary*" shall mean any operational salary that may be paid to a Member by any Related Entity.

"*Dissociation*" means any action listed in Section 4.16 which causes a Person to cease to be a Member.

"*Initial Members*" shall have the meaning given such term in the Preamble of this Agreement.

"*Majority of the Members*" means the Members holding more than fifty percent (50%) of the Membership Interests in the Company entitled to vote.

"*Managing Member*" means a Member of the Company who is selected to manage the business and affairs of the Company in accordance with the terms of this Agreement.

"*Member*" means any Person executing this Agreement as a Member, owning either Class A or Class B Membership Interests, as of the date of this Agreement, or whom hereafter is admitted to the Company as a Member in accordance with the terms of this Agreement, but does not include any Person who has ceased to be a Member in the Company.

"*Membership Interest*" means the ownership interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent to approve, all in accordance with the provisions of this Agreement and the Act. Membership Interests are expressed in this Agreement as percentages.

"*Net Operating Income*" means the Company's net income per its federal income tax return ("Ordinary business income (loss)" – Line 22), plus actual Members' distributions other than distributions from Members' capital, less Contract Salary earned but not paid or plus Contract Salary overpaid, plus ex-Member buy out payments, minus other income or plus other loss (per federal income tax return "Other Income (loss)" – Line 7). References to line numbers relate to such lines on page 1 of the IRS Form 1065, 2008 U.S. Return of Partnership Income (subject to a potential change of line number on future IRS Forms 1065, which such changes shall be incorporated by reference herein). When calculating the Net Operating Income of the Company in connection with the determination of the Purchase Price of a Class B Member's Membership Interest, fifty percent (50%) of all real estate commissions actually paid to such Class B Member during the four-year-look-back period pursuant to such Member's independent contractor agreement with the Company shall be subtracted from the Net Operating Income of the Company. See Schedule D attached hereto for an illustration of the calculation of the Purchase Price of a one percent Class B Membership Interest using this alternate valuation formula.

"*Permanent Disability*" shall mean the inability of the Member, due to illness, accident, or any other physical or mental incapacity or impairment, to perform his or her daily and normal activities for the Company for any ninety (90) or more consecutive calendar days, or for shorter periods aggregating one hundred twenty (120) days, not necessarily consecutive, during any consecutive twelve (12) month period during the term of this Agreement. Member and Company shall agree upon whether or not the Member is disabled and when such disability commenced. If Company and Member are unable to agree, then Company shall select a physician acceptable to it and Member shall select a physician acceptable to him or her. The two physicians so selected shall select a third physician acceptable to them within ten (10) days of the selection of the second physician and the three physicians so selected shall determine, by majority vote, whether said Member is disabled and when such disability commenced. The determination to be made by the three physicians shall be made within ten (10) days of the selection of the third physician. No physician may be empanelled unless he or she agrees to make all required decisions within ten (10) days of the selection of the third physician. If Company and Member shall fail to select a physician within ten (10) days of the date of selection

of a physician by the first of them to select a physician, the first designated physician shall exclusively make all required decisions under this definition.  Final decisions made under and in accordance with the terms of this definition shall, when made, be binding upon Company and Member.

"*Person*" means an individual, partnership, corporation, limited liability company, joint venture, trust, unincorporated association or any other entity.

"*Related Entity*" shall mean any entity of which a Member (or Members) owns or controls more than fifty percent (50%) of the outstanding voting or equity interests of such entity.

"*Super-Majority of the Members*" means the Members holding more than sixty percent (60%) of the Membership Interests in the Company.

"*Transfer*" shall have the meaning specified in Section 8.1.

"*Treasury Regulations*" means the regulations promulgated under the Code from time to time by the United States Department of Treasury.

Other terms defined in this Agreement have the meanings so given them.

### 1.2.    *Construction*.

Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  All references to Articles and Sections refer to Articles and Sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes.

## ARTICLE II
## ORGANIZATION

### 2.1.    *Formation*.

The Company has been organized as a Pennsylvania limited liability company by the filing of a Certificate of Organization (the "Certificate") on December 23, 2004 with the Department of State of the Commonwealth of Pennsylvania under and pursuant to the Act.

### 2.2.    *Name*.

The name of the Company is "Lanard & Axilbund, LLC" and all Company business shall be conducted in that name or such other names that comply with applicable law as the Initial Members may select from time to time.

### 2.3.    *Registered Office; Principal Office; Other Offices*.

The registered office and the principal place of business of the Company required by the Act to be maintained in the Commonwealth of Pennsylvania shall be 399 Market Street,

LLC Agreement 7.1.10 (2)-v7

3rd Floor, Philadelphia, Pennsylvania, 19106, or such other office as the Managing Member may designate from time to time in the manner provided by law.  The Company shall maintain its records at the Company's principal office.  The Company may have such other offices as the Managing Member may designate from time to time.

### 2.4. *Purpose.*

The Company is organized to:  (i) own and operate a real estate agency and brokerage firm; and (ii) to conduct any other lawful act or activity for which limited liability companies may be organized under the Act.  The Company shall have all the powers provided for a limited liability company under the Act or any successor statute.

### 2.5. *Taxation, No State Law Partnership.*

It is the express intention of the Members that the Company be taxed as a partnership for federal, and to the extent permissible, state tax purposes.  It is the further intention of the Members that the Company not be a partnership or joint venture for any purpose other than federal, and to the extent permissible, state tax purposes, and this Agreement shall not be construed to suggest otherwise.

### 2.6. *Foreign Qualification.*

Prior to the Company's conducting business in any jurisdiction other than the Commonwealth of Pennsylvania, the Managing Member shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction.  At the request of the Managing Member, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

### 2.7. *Term and Fiscal Year.*

The Company commenced doing business on the date that the Certificate was filed with the Department of State of the Commonwealth of Pennsylvania and shall continue in existence for an indefinite term, unless earlier terminated or dissolved as set forth in this Agreement, or as provided by applicable law.  The fiscal year of the Company shall be the calendar year.

### 2.8 *Colliers International Affiliation Agreement.*

The Company has entered into an Affiliation Agreement with Colliers International, which may be amended from time-to-time (the "Affiliation Agreement").  Notwithstanding anything herein to the contrary if and to the extent that the Affiliation Agreement, or any amendment thereto, includes any provisions which are inconsistent with this Agreement, such provisions of the Affiliation Agreement, or any amendment thereto, shall prevail and control over this Agreement.

## ARTICLE III
## MANAGEMENT

### 3.1.    *Management by Managing Member; Exclusive Responsibility.*

The management of the business and affairs of the Company shall be the sole and complete responsibility of the Managing Member.  L&A shall serve as the Managing Member. The Members, except if a Member is the Managing Member, shall not take part in, or interfere in any manner with, the management, conduct or control of the business and affairs of the Company, and shall not have any right or authority to act for or bind the Company.  The Company may act only by actions taken or authorized by the Managing Member in accordance with this Agreement.

### 3.2.    *Non-Exclusive Service.*

The Managing Member shall devote services to the Company and its Affiliates on a substantially full-time basis.  The Managing Member may be compensated for its services to the Company.

### 3.3.    *Term of Managing Member.*

The Managing Member shall serve until the earliest of:  (i) his, her or its resignation as Managing Member; (ii) his, her or its liquidation or dissolution, or (iii) his, her or its removal pursuant to Section 3.7.

### 3.4.    *Conduct of Company Affairs by the Managing Member.*

The Managing Member shall have the authority to perform the following acts:

*(a)*      to enter into contracts, leases and agreements obligating the Company;

*(b)*      to borrow money for the Company from banks, other lending institutions, Members, or Affiliates of Members on such terms as the Managing Member deems appropriate, and in connection therewith, to mortgage, hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

*(c)*      to sell, exchange or otherwise dispose of all, or substantially all, of the Company's assets as part of a single transaction or plan;

*(d)*      to execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents provided for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases, partnership agreements, operating agreements of other limited liability companies, and any other instruments or documents necessary, in the opinion of the Managing Member, to the business of the Company;

(e)      to purchase liability and other insurance to protect the Company's property and business;

(f)      to invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(g)      to employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds; and

(h)      to do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

3.5.    **_Binding Effect of Actions._**

Each Member shall be bound by, and hereby consents to, any and all actions taken and decisions made by the Managing Member in accordance with the terms of this Agreement. Any person designated in writing by the Managing Member, including a Member so designated in writing, shall have the authority to bind the Company.  Except as provided in this Section 3.5, no Member shall have authority to bind the Company.

3.6.    **_Business Transactions._**

Notwithstanding any other provision of this Agreement, unless approved by a majority of the votes of the Members, the Company may not:

(a)      engage in a merger or consolidation with or into any corporation, partnership, limited liability company or any other entity, whether or not the Company shall be the surviving entity of such merger or consolidation;

(b)      sell all or substantially all of its assets to any person or entity;

(c)      divide into two or more limited liability companies;

(d)      amend the Certificate;

(e)      admit a new Member; or

(f)      incur indebtedness on behalf of the Company of $200,000 or more in one transaction or in more than one related transaction.

3.7.    **_Removal; Substitute Managing Member._**

(a)      _Removal of the Managing Member_.  The Managing Member may be removed from the position of Managing Member (but not as a Member), for Cause, by vote of a Super-Majority of the Members.  Action to remove the Managing Member shall not be effective until the later of:  (i) thirty (30) days after delivery to the Managing Member of written

notice of his, her or its removal; or (ii) a replacement Managing Member has been elected by a Super-Majority of the Members.

(b) *Substitute Managing Member*. The Managing Member may withdraw from the position of Managing Member with not less than thirty (30) days written notice to the Members either:

(i) with the prior vote, consent or agreement of a majority of the votes of the Members; or

(ii) without the vote, consent or agreement of a majority of the votes of the Members if an Affiliate of the Managing Member will assume the management duties of the Managing Member.

Moreover, the vote, consent or approval of the majority of the votes of the Members shall not be required to authorize the Transfer of all or a portion of the Managing Member's Membership Interests to an Affiliate of the Managing Member and such Affiliate will then be substituted as the Managing Member.

3.8. *Limitation of Liability*.

Neither the Managing Member nor any Affiliate of the Managing Member shall be personally liable, as such, for monetary damages (other than under criminal statutes and under Federal, state and local laws imposing liability on Managing Members for the payment of taxes) for any action taken, or any failure to take any action, unless the person's conduct constitutes improper self-dealing, willful misconduct or recklessness. No amendment or repeal of this Section shall apply to or have any effect on the liability or alleged liability of any person who is or was the Managing Member of the Company for or with respect to any acts or omissions of the Managing Member occurring prior to the effective date of such amendment or repeal. If the Act is amended to permit a limited liability company to provide greater protection from personal liability for its Managing Member than the express terms of this Section, this Section shall be construed to provide for such greater protection.

3.9. *Reports*.

The Managing Member, for the twelve (12) month period commencing on the Effective Date, shall provide monthly reports to the Members concerning the performance of the Company. Thereafter, the frequency of such reports shall be determined by a Majority of the votes of the Members, but in no event shall such reports be provided more frequently than monthly.

3.10 *Compensation*.

The Managing Member may receive compensation for its services rendered. The amount of such annual compensation shall remain equal to the amount paid to the Managing Member for the calendar year 2010. Thereafter, the compensation shall be: (i) increased only if both the value of the Company increases, such value to be determined using the valuation formula set forth in Schedule D, and the Net Operating Income increases by more than five

percent (5%), each increase of compensation not to exceed three percent (3%); (ii) decreased in the event that both gross revenue and Net Operating Income decrease by at least five percent (5%), in which event compensation shall decrease by three percent (3%).

## ARTICLE IV
## MEMBERS AND MEMBERSHIP INTERESTS

### 4.1.    *Members*.

A schedule of current Members shall be kept at the principal office of the Company.  No Member shall be personally liable for any of the debts, losses, claims, judgments or any of the liabilities of the Company beyond the Members' Capital Contributions to the Company, except as provided by law.

### 4.2.    *Record Holders of Membership Interests*.

The Company shall be entitled to treat the Person in whose name a Membership Interest stands on the books of the Company as the absolute owner thereof and as a Member of the Company.  The Company shall not be bound to recognize any equitable or other claim to, or interest in, such Membership Interest on the part of any other Person, whether or not the Company has express or other notice of any such claim.

### 4.3.    *Class A Members*.

DRS, RBS and L&A each hold Class A Membership Interests and the initial Capital Accounts with respect thereto are as set forth on Schedule A (each a "Class A Member" and collectively the "Class A Members") attached hereto.

### 4.4.    *Class B Members*.

(a)     The Company may authorize and issue Class B Membership Interests to Persons selected by the Managing Member and as authorized by a vote of a Super-Majority of the Members from time to time (each a "Class B Member" and collectively the "Class B Members").  Such Class B Members, except Class B Members who acquire their Membership Interests from other Members, shall contribute to the Company an amount determined in the same manner as the purchase price of Class B Membership Interests as set forth in Section 8.7(a) of this Agreement and shall receive the percentage of Class B Membership Interest and initial Capital Accounts shown on Schedule A, as amended at the time of their admission as Class B Members of the Company.

(b)     Each such admission shall be reflected in an amendment to this Agreement.  In the event any additional Members are admitted to the Company, the Membership Interests in the Company of the most recently admitted Member(s) shall be as specified at the time such new Member(s) shall be admitted, and the Membership Interests in the Company of all other Members of the Company shall be proportionately reduced.  The foregoing shall not apply to any substituted Member who is the transferee of a Membership Interest from another Member.

(c)      No Membership Interests shall be issued by the Company at a price less than the amount that would be determined with respect to a Class B Membership Interest in accordance with Section 8.7(a) of this Agreement without the prior written unanimous consent of the Class A and Class B Members, except that the consent of all except one of the Class A and Class B Members shall be sufficient if there are more than three Class A and Class B Members.

(d)      *Membership Requirements.*

(i)      Prior to admission as a Class B Member, a Person must have a minimum of five (5) years of experience as a commercial real estate sales person or in a real estate related profession.  Commercial real estate sales persons desiring to become Class B Members must have generated and maintained a three-year average annual gross real estate commission equal to or exceeding Four Hundred Thousand Dollars ($400,000).

(ii)      Further, the following attributes shall be considered in deciding whether a Person shall be admitted as a Class B Member:

1.   Whether the Person has taken a leadership role in the Company;

2.   Whether the Person is a "team player;"

3.   Whether the Person has taken an active role in their community;

4.   Whether the Person is a member of, and actively participates in, appropriate professional organizations for real estate professionals.

(e)      *Nomination and Approval of Class B Members.*

(i)      The Managing Member shall determine which Persons shall be offered the opportunity to purchase a Class B Membership Interest in the Company (a "Class B Nominee") and the percentage of Class B Membership Interest that such Class B Nominee may purchase.

(ii)      A Super-Majority of the Members must approve a Class B Nominee for Class B Membership in the Company, prior to the purchase of any Class B Membership Interests by such Class B Nominee.

(f)      *Voting Rights.*  Class B Members shall be entitled to vote, in accordance with their percentage Membership Interests on any matters submitted to a vote of the Members of the Company.

LLC Agreement 7.1.10 (2)-v7

(g) _Removal_.  A Class B Member's Membership Interest shall be subject to the Mandatory Offer provisions set forth in Section 8.11 of the Agreement upon a determination by Members holding a Super-Majority of Membership Interests that the Class B Member has not sustained the standards that formed the basis of his or her admission as a Class B Member.

(h) _Termination for Cause_.  In the event of the termination for Cause of a Class B Member, all of such Class B Member's Membership Interest shall be subject to the Mandatory Offer provisions set forth in Section 8.11 of the Agreement.  The Purchase Price of the Class B Membership Interest of any Class B Member terminated for Cause shall be determined in accordance with Section 8.7 of the Agreement except that the Purchase Price so determined shall be subject to a fifty percent (50%) discount; provided, however, that the application of such fifty percent (50%) discount is first approved by Members holding at least ninety percent (90%) of the Membership Interests of the Company (excluding the Class B Member terminated for Cause).

(i) _Violation of Confidentiality, Non-Disclosure, Non-Competition and Non-Solicitation Covenants_.  In the event a Class B Member who is an employee or independent contractor of the Company breaches the terms of the confidentiality, non-disclosure, non-competition and non-solicitation provisions of his or her employment or independent contractor agreement with the Company or the Agreement, all of such Class B Member's Membership Interest shall be subject to the Mandatory Offer provisions set forth in Section 8.11 of the Agreement.  The Purchase Price of the Class B Membership Interest of any breaching Class B Member employee or independent contractor shall be determined in accordance with Section 8.7 of the Agreement except that the Purchase Price so determined shall be limited to the aggregate amount that such Class B Member originally paid for his or her Class B Membership Interest in the Company, unless such Class B Member is also terminated for Cause, in which case Section 4.4(f) herein shall control the determination of the Purchase Price.

(j) _Mandatory Retirement_.  All Class B Members shall be subject to a mandatory retirement age of sixty-five (65).  Upon attaining the age of sixty-five (65), all of a Class B Member's Membership Interest shall be subject to the Mandatory Offer provisions set forth in Section 8.11 of the Agreement; provided, however, that a Class B Member who has attained the age of sixty-five (65) may retain his or her Membership Interest for an additional one-year period upon the approval of a Super-Majority of the Members (excluding the Class B Member who has attained the age of sixty-five (65)).  The continued participation of a Class B Member who has attained the age of sixty-five (65) as an owner of the Company shall be re-assessed annually by the Members and may be extended for consecutive one-year periods upon the approval of a Super-Majority of the Members (excluding the Class B Member who previously attained the age of sixty-five (65)).

   4.5. _Admission of Interest Holders as Members_.

   Subject to the other provisions of this Article IV, a transferee of a Membership Interest may be admitted to the Company as a substituted Member only upon satisfaction of the conditions that follow:

LLC Agreement 7.1.10 (2)-v7

(a)    The Managing Member consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Managing Member;

(b)    The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Managing Member may reasonably request (including, without limitation, amendments to the Certificate) as may be necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions hereof;

(c)    The transferee pays or reimburses the Company for all reasonable legal, accounting, filing, publication and other costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the transferred Membership Interest to the extent such reimbursement is requested by the Managing Member; and

(d)    If the transferee is not an individual of legal majority, the transferee provides the Company with evidence satisfactory to counsel for the Company of the ability and authority of the transferee to become a Member and to be bound by and perform the terms and conditions of this Agreement.

**4.6.    _Capital Account of Transferee_.**

Upon the valid Transfer of a Membership Interest, the transferee shall succeed to the corresponding portion of the Capital Account of the transferor Member.

**4.7.    _Lack of Authority_.**

A Member in his, her or its capacity as such, shall not have the authority or power to act for or on behalf of the Company or otherwise bind the Company in any way.

**4.8.    _Status of Membership Interest_.**

The Membership Interests owned by the Members are fully paid and non-assessable. A Member's Membership Interest shall for all purposes be personal property.

**4.9.    _No Appraisal Rights_.**

No Member shall be entitled to any appraisal rights with respect to such Member's Membership Interest, whether individually or as part of any class or group of Members, in the event of a merger, consolidation or other transaction involving the Company or its equity unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction.

**4.10.    _Annual Meetings; Special Meetings_.**

An annual meeting of the Members shall be held on the first Monday in February of each year. At such meeting, the Members shall transact such business as may properly be brought before the meeting. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by a majority of the votes of the Members

or by any Member entitled to vote at the proposed special meeting.  Only business within the purpose or purposes described in the notice of special meeting of Members may be conducted at such special meeting.

### 4.11.   *Place of Meetings.*

Meetings of Members shall be held at such places, within or without the Commonwealth of Pennsylvania, as may from time to time be fixed by a majority of the votes of the Members or as shall be specified or fixed in the respective notices or waivers of notice thereof.

### 4.12.   *Notice of Meetings.*

Written or printed notice stating the place, day and hour of each meeting of the Members and, in case of a special meeting, the purpose or purposes for which the special meeting is called, shall be delivered not less than five (5) nor more than ten (10) days before the date of the meeting, either personally or by mail, telegram, express courier or telefax or similar communication, by or at the direction of the Member(s) calling the meeting, to each Member.

### 4.13.   *Voting by Members.*

(a)   Except as otherwise set forth herein, all actions and votes of the Members shall be by a majority of the votes of the Members present and voting at a meeting at which there is a quorum present and not on a per capita basis.  The Members shall be entitled to vote, in accordance with their percentage Membership Interests, on any matters submitted to a vote of the Members.  Thus, for example, DRS holding a 49.5 percent Membership Interest shall have 49.5 votes.

(b)   At any meeting of the Members, every Member having the right to vote shall be entitled to vote either in person or by proxy executed in writing by such Member.  A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by a Member, shall be treated as an execution in writing for purposes of this Section 4.13.  No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.  Each proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.  Each proxy shall be delivered to the Company prior to or at the time of the meeting of the Members.

### 4.14.   *Quorum of and Action by Members.*

A majority of the votes of the Members, represented in person or by proxy, shall be requisite to and shall constitute a quorum at each meeting of Members for the transaction of business, except as otherwise provided by statute.  Except as otherwise set forth herein, with respect to any matter, an affirmative vote of the majority of the votes of the Members shall be required to constitute the act of the Members.  A majority of the votes of the Members represented in person or by proxy at a meeting of the Members at which a quorum is not present may adjourn the meeting until such time and to such place as may be determined by them.  At

any such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally convened.

### 4.15. *Action Without a Meeting; Telephone Meetings.*

Any action required or permitted by the Act, or which may otherwise be taken at any annual or special meeting of the Members, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the Members. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section 4.15. Subject to the provisions of applicable law and this Agreement regarding notice of meetings, Members may participate in and hold a meeting by using conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a telephone meeting pursuant to this Section 4.15 shall constitute presence in person at such meeting, except when a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

### 4.16. *Dissociation.*

(a)    A Person shall cease to be a Member upon the happening of any of the following events:

(i)    the expulsion of a Member prior to the termination of this Agreement upon dissolution of the Company, which may be effected only by a ninety percent (90%) vote of the Members, other than the Member subject to expulsion, and upon a finding that the Member has materially breached this Agreement, has engaged in conduct, in connection with the business of the Company or otherwise, which is materially detrimental to its interests or is grounds for conviction of a felony or a crime involving moral turpitude;

(ii)    the Member becomes Bankrupt;

(iii)    in the case of a Member who is a natural person, the death of the Member or Permanent Disability of the Member;

(iv)    in the case of a Member that is not an individual and is not a corporation, the dissolution and commencement of winding up of the Member;

(v)    in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its corporate charter;

(vi)    in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company; or

(vii)    upon a finding that a Member materially breached the Member's independent contractor agreement with the Company, if applicable to such Member.

*(b)*    Upon a Member's dissociation from the Company, such Member (or the successor in interest to such Member) shall have the rights of an assignee of an interest under the Act to receive allocations and distributions under this Agreement, but shall have no other rights hereunder.

## ARTICLE V
## FINANCIAL AND TAX MATTERS

5.1.    *Capital Contributions.*

The Company shall keep a record of the Capital Contributions made by the Members.  In exchange for their Membership Interests in the Company, the Members have made the Capital Contributions to the Company set forth on Schedule A to this Agreement.  The Members shall not be entitled to receive any interest on any Capital Contribution.  All Members shall be obligated to make such additional Capital Contributions or to provide any loan or advance to or for the benefit of the Company, or to restore any deficit balance in his, her or its Capital Account, or otherwise to provide any credit or guarantees in connection with the business of the Company (a "Capital Call") as the Managing Member may determine; provided that the foregoing shall not affect any liability of a Member under any provision of the Act.  In the event, however, that a Member shall fail to make a Capital Call in proportion to his, her or its Membership Interest (a "Defaulting Member"), at the election of any Member covering the unfunded Capital Call of such Defaulting Member, either:  (a) the Defaulting Member will be treated as if he, she or it made such Capital Call and will be obligated to pay the amount of his, her or its proportionate share of the Capital Call to the Member(s) who, in fact, made such Capital Call; or, (b) the Member covering the unfunded Capital Call will be treated as having made an additional Capital Contribution to the Company.  Whenever a Member makes an additional Capital Contribution, then Schedule A to this Agreement shall be amended to reflect such additional Capital Contribution made by the Member and to reflect an appropriate adjustment, if any, to his, her or its percentage Membership Interest in the Company.

5.2.    *Return of Capital.*

Although the Company may make distributions to the Members from time to time as a return of the Member's Capital Contributions, no Member shall have the right to withdraw his, her or its Capital Contributions or the balance in his, her or its Capital Account or to receive any return of any portion of his, her or its Capital Contributions or the balance in his, her or its Capital Account until the Company has been dissolved and terminated, except as provided in this Agreement.

5.3.    *Capital Accounts.*

At all times while there is more than one Member of the Company, a separate Capital Account shall be established and maintained for each Member as follows:

(a)    At any time during which the Company is treated for Federal income tax purposes as a partnership, there shall be established and maintained on the books of the Company a Capital Account for each Member. Each Member's Capital Account shall be determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Code Section 704(b) and Treasury Regulations Section 1.704-l(b). Each Member's Capital Account shall be credited with the amount of cash and the fair market value of any property contributed to the Company by such Member and the share of the profits allocated to such Member pursuant to Section 5.4 hereof. Each Member's Capital Account shall be debited with the amount of cash and the fair market value of any property distributed to or withdrawn by such Member and the share of the losses allocated to such Member pursuant to Section 5.4 hereof. A Member shall not be obligated to restore any deficit in his, her or its Capital Account. A Member shall not be entitled to any interest on such Member's Capital Contributions or Capital Account, or to receive any distribution or make any withdrawal from the Company, except as specifically provided in this Agreement.

(b)    When Company property is distributed in kind to the Members (whether in connection with dissolution and liquidation of the Company or otherwise), the Capital Accounts of the Members first shall be adjusted to reflect the manner in which the unrealized income, gain, loss or deduction inherent in such property (that has not previously been charged to the Members' Capital Accounts) would be allocated among the Members if there were a taxable disposition of such property for its fair market value (taking into account Code Section 7701(g)) and such income, gain, loss or deduction had been recognized for Federal income tax purposes immediately upon such distribution.

(c)    The allocation and capital account maintenance provisions of Treasury Regulations under Code Section 704 are hereby incorporated by reference, including a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Treasury Regulations Section 1.704-2(i)(1), "minimum gain chargeback" under Treasury Regulations Section 1.704-2(f) and "partner nonrecourse debt minimum gain chargeback" under Treasury Regulations Section 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of minimum gain and partner nonrecourse debt minimum gain under Treasury Regulations Section 1.704-1(b)(2)(ii)(d) as modified by Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5).

### 5.4.    _Profits and Losses._

(a).    Except as otherwise provided in this Section 5.4, all profits or losses shall be determined for book purposes on the same basis as the Company's taxable income or loss under the Code by taking into account all items of income, expense, deduction, gain or loss.

(b)    All income, expenses, deductions, credits, profits and losses generated by the Company shall be allocated to the Members in accordance with each Member's respective Membership Interest percentage.

LLC Agreement 7.1.10 (2)-v7

5.5.   *Distributions.*

   (a)   *General Rule.*  Except as otherwise provided in this Article V, the Managing Member in his, her or its sole discretion may authorize the Company to make distributions to the Members.  All distributions, other than liquidating distributions, shall be made to the Persons shown as holders of record of Membership Interests at the time of the distribution and in proportion to their interests in the Company's profits.

   (b)   *Minimum Distribution.*  With respect to any taxable year of the Company in which Members are allocated taxable income for Federal income tax purposes (and for this purpose all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703 shall be included in the calculation of taxable income (other than the amount, if any, by which capital losses exceed capital gains)), the Company shall attempt to distribute to the Members, within ninety (90) days after the close of that taxable year, no less than the amount determined by multiplying the Company's taxable income (computed as set forth in this sentence) by the highest composite Federal, state and local income tax rate applicable to any Member.  In the event the Company's income includes capital gains, the calculation with regard to the capital gain shall be the Company's capital gain multiplied by the highest composite federal, state and local capital gains rates, with respect to the character of the capital gain (long-term or short-term).  Nothing herein shall require the Company to borrow money or reduce its cash flow so as to restrict its ability to operate the day-to-day activities of the business in order to make such minimum distributions.  The determination of the Managing Member in this regard shall be binding.

5.6.   *Special Allocations.*

   (a)   Except as provided elsewhere in this Section 5.6, or as otherwise required by law, or as agreed to by all of the Managing Members and permitted under the Code, if the Membership Interests are changed hereunder during any taxable year, all items to be allocated to the Members for such entire taxable year shall be prorated on the basis of the portion of such taxable year which precedes each such change and the portion of such taxable year on and after each such change according to the number of days in each such portion.  Such items shall be allocated to the Members in the same manner provided in this Section 5.6 during each such portion of the taxable year in question.

   (b)   Any special allocation of income or gain pursuant to this Section 5.6 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Section 5.6 so that the net amount of all such allocations to each Member shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 5.6 if such special allocations of income or gain under Section 5.6 had not occurred.

   (c)   All matters not expressly provided for by the terms of this Agreement concerning the valuation of assets of the Company, the allocation of profits, gains, deductions, losses and credits among the Members and accounting procedures shall be reasonably determined by the Managing Member, in consultation with the Company's counsel and accountants.

LLC Agreement 7.1.10 (2) v7

### 5.7.   *Establishment of Reserves.*

The Managing Member shall have the right and shall attempt to establish reasonable reserves for maintenance, improvements, acquisitions, capital expenditures and other contingencies, to the extent reasonably possible, such reserves to be funded with such portion of the operating revenues of the Company as the Managing Member may in his, her or its sole judgment deem necessary or appropriate for that purpose.

### 5.8.   *Filing of Tax Returns.*

The Company shall prepare and file, or cause the accountants of the Company to prepare and file, a federal information tax return in compliance with the Code and any required state and local income and other tax and information returns for each tax year of the Company. L&A shall act as the "Tax Matters Partner" of the Company, as that term is defined in Code Section 6231(a)(7). The Company shall report its income for tax purposes using the cash basis method of accounting, or such other method as the Tax Matters Partner, with the advice of the Company's accountants, shall determine. The Tax Matters Partner shall promptly advise the other Members of audits or other actions by the Internal Revenue Service.

### 5.9.   *Tax and Financial Reports.*

Within ninety (90) days after the end of each fiscal year, the Company shall prepare and deliver, or cause its accountants to prepare and deliver, to each Member or his or her legal representatives, a copy of the Company's tax return for such fiscal year and such other supplemental information as is required to be furnished to Members by law (e.g., Code Section 6031(b) and the Treasury Regulations thereunder) and as shall enable such Member (or his or her legal representatives) to prepare such Member's federal and state income tax returns in accordance with the laws, rules and regulations then prevailing.

### 5.10.   *Section 754 Election.*

The Managing Member, in his, her or its sole discretion, and shall, if required by applicable law, cause the Company to elect, pursuant to Section 754 of the Code, to adjust the basis of Company property as provided in Sections 734(b) and 743(b) of the Code. The Managing Member shall be responsible for determining the adjustments required or permitted by said sections of the Code, provided that, in the case of any adjustment required or permitted under Section 743(b) of the Code, the transferor or transferee shall be solely responsible for determining the adjustments required thereunder unless such Member or Members provide the Company with all the information necessary for the Managing Member to determine the adjustments. If any adjustments to the basis of Company property are made pursuant to Section 732(d), 734(b) or (743(b), the Capital Accounts of the Members shall be adjusted as specified in Treasury Regulations §1.704-1(b)(2)(iv)(m).

## ARTICLE VI
## LIABILITIES; INDEMNIFICATION; MEMBER TRANSACTIONS

### 6.1. *Indemnification of a Member.*

The Company shall indemnify, to the fullest extent permitted by law, a Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that the Person at any time is or shall have been a Member of the Company against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such action or proceeding, unless the act or failure to act giving rise to the claim for indemnification is determined to have constituted willful misconduct or recklessness.

### 6.2. *Payment of Expenses.*

Expenses incurred by a Member in defending an action or proceeding against which indemnification may be made under this Agreement may be paid by the Company in advance of the final disposition of such action or proceeding upon receipt of an undertaking by or on behalf of such Person to repay such amount if it shall ultimately be determined that such Person is not entitled to be indemnified by the Company.

### 6.3. *Assumption of Personal Liability.*

The Members shall assume personal liability for or personally guarantee obligations of the Company as determined necessary by the Managing Member. To the extent that any or all of the Members assume personal liability for or personally guarantee obligations of the Company, the Members shall share such personal liability on a pro rata basis, based upon their respective percentage Membership Interests in the Company.

### 6.4. *Member Transactions.*

(a)     No Member shall purchase any real estate, other than a personal residence (or vacation homes) or residence limited to the use of the Member's immediate family, without first offering in writing to all Members owning more than a ten percent (10%) Membership Interest an opportunity to participate equally in the purchase of such real estate. Members that do not own more than a ten percent (10%) Membership Interest may participate in Member transactions described in this Section if selected and to the extent determined by the Managing Member. Any Member desiring to participate in the purchase of such real estate shall give notice of his or her desire within ten (10) days after receipt of the offer to participate in the purchase. All eligible Members participating in the purchase of the real estate shall participate equally irrespective of their relative Membership Interests in the Company.

(b)     *Passive Projects.* A Member may, upon giving prior written notice to the Managing Member, invest or participate in a passive real estate project (a "Passive Project") only upon the satisfaction of the conditions set forth below in this Section 6.4(b) (an "Investing Member"):

LLC Agreement 7.1.10 (2)-v7

(i)      The Investing Member and his or her "Family" (as defined herein) do not have a controlling interest in the Passive Project or own more than a forty-nine percent (49%) interest in the Passive Project.  "Family," for purposes of this Section 6.4(b), shall include the spouse, children, parents, parents-in-law, siblings and spouses of the siblings of the Investing Member;

(ii)      Neither the Investing Member nor his or her Family receive any commissions on the purchase, sale, lease or management of the Passive Project unless such commission is received from the Company or an Affiliate;

(iii)      The Investing Member has presented the Passive Project to the Company and the other eligible Members for participation, provided the developer of the Passive Project is willing to do so, and further provided that the Investing Member has made known to the Passive Project developer the possible interest of the Company and/or its Members;

(iv)      The Investing Member is not one of the initiators and/or developers of the Passive Project (including, but not limited to, locating the property and/or tenant) and is merely an invitee to the Passive Project;

(v)      The Passive Project is not in direct competition with the business of the Company or its Affiliates and/or one or more of either of their clients;

(vi)      The Investing Member will take no part in the day to day operation and/or decisions regarding the Passive Project;

(vii)      The Investing Member shall make no use of the staff, materials or equipment of the Company or its Affiliate in connection with the Passive Project; and

(viii)      The developer has a good business and moral reputation.

The Investing Member, to whom the opportunity was first offered, who is involved in a Passive Project may not trade his or her skill or knowledge directly, indirectly, or in consideration of past services or otherwise in real estate matters in exchange for an interest in the Passive Project.

(c)      *Non-Passive Projects*.  A Member may, upon receiving the prior written consent of the Managing Member, which consent shall not be unreasonably withheld, invest in or participate in a project which does not constitute a Passive Project (a "Non-Passive Project"), provided such Investing Member first presents the Non-Passive Project for participation to all other Members holding ten percent (10%) or more of the Company's Membership Interests directly or indirectly through an ownership interest in any of the Company's Affiliates.  Such eligible Members shall be entitled, if they so choose, to invest equally with the Investing Member in the Non-Passive Project.

If the developer of the Non-Passive Project is unwilling to offer an interest in the Non-Passive Project to anyone other than the Investing Member, the Investing Member

LLC Agreement 7.1.10 (2)-v7

shall not be entitled to invest in or participate in the Non-Passive Project without the unanimous consent of the Managing Members.

## ARTICLE VII
## CONFIDENTIALITY; NON-DISCLOSURE; NON-COMPETITION AND NON-SOLICITATION

### 7.1.   *Property.*

A Member shall not, without the express written approval of the Managing Member, engage in or participate in any real estate business, transaction or dealing other than for the account of or on behalf of the Company or, own, lease, buy or sell any real estate whatsoever except that which shall be used by such Member and his family as a primary or secondary dwelling and shall not accept from any Person, other than broker fees, any commissions or gifts arising out of or in connection with any real estate business, transaction or dealing.

### 7.2.   *Members' Confidentiality Obligation.*

Member has or will be given access to certain proprietary, private and confidential information of the Company.  Member shall not at any time (except during the course of and within the scope of his/her engagement by the Company) communicate, disclose or divulge to any Person,  or use for his own benefit or for the benefit for any Person,  any proprietary, private or confidential information which Member may heretofore have received or hereafter receives concerning the Company or with respect to the conduct and details of the business conducted by the Company including, but not limited to, information relating to lease expirations for tenants and prospective tenants and landlords and prospective landlords, lists of customers and of prospective customers, mailing lists of customers and prospective customers, current tenant lists, information relating to rent-rolls and lease terms, information relating to arrangements with salespeople of the Company and to the terms and conditions of management contracts of the Company and to arrangements for compensation and present and future plans, business methods, forms, statistics, credit information sources of financing or any other confidential information, no matter from whom or in what manner he or she may have acquired such information.

### 7.3.   *Non-Solicitation.*

While he or she is a Member hereunder, and for a period of two (2) years thereafter, such Member shall not, directly or indirectly, whether as an employee, principal, partner, agent, stockholder, independent contractor, consultant or otherwise:

(a)     Solicit either directly or indirectly any Clients, as defined in Section 7.6, whose businesses are located where the Company is licensed or with respect to real estate or business located outside the primary and secondary markets in which the Company does business ("Local Exclusions") which are owned by Clients of the Company which Clients maintain a place of business in the Local Exclusions, or with respect to Corporate Services Clients of the Company (as defined in Section 7.6), any place worldwide. It is understood, however, that the Member shall not be restricted from brokering a single lease or sale/purchase transaction for Corporate Services Clients outside from Local Exclusions, which is not otherwise restricted by sub-section (i) ; or

(b)      Seek to influence, or influence, any other salesperson or employee of the Company to terminate his or her relationship with the Company.

### 7.4.   *Injunctive Relief.*

(a)      Member acknowledges that irreparable injury will result to the Company's business if Member breaches any of the covenants contained in this, Article VII, and that the Company's remedies at law will be inadequate; therefore, the Company shall be entitled, in addition to any other remedies or damages available, to specific performance of injunctive relief to restrain violation thereof by Member.

(b)      If the Company shall find it necessary to resort to the courts for enforcement of any of the restrictive covenants contained in this, Article VII the term of such restrictive covenant shall be extended by a period of time equal to the period of time during which Member was in violation of such restrictive covenant.

### 7.5.   *Saving Clause.*

Member agrees that if any portion of the foregoing covenants, or the application thereof, is construed to be invalid of unenforceable, the remainder of such covenant or covenants of the application thereof shall not be affected and the remaining covenant or covenants will then be given full force and effect without regard to the invalid or unenforceable portions. If any covenant is held to be unenforceable because of the area covered, the duration thereof, or the scope thereof, Member agrees that the court making such determination shall have the power to reduce the area and/or duration and/or scope thereof and the covenant shall then be enforceable in its reduced form.

### 7.6.   *Definition of "Client."*

For purposes of this Agreement, the term "Client" shall mean any Person that engaged the Company to perform any service, or paid the Company a commission fee within five (5) years of a Member's termination. Additionally, a Client is an entity that has leased as lessor or lessee or sold/purchased properties in a transaction in which the Company was a broker, within five (5) years of termination of a Member's contract.

Client shall include any entity that is, at a Member's termination, working with the Company or who has worked with or been actively solicited by the Company within the three (3) year period prior to termination of a Member's contract in an effort to (a) lease as lessor or lessee or purchase/sell property, or (b) obtain an exclusive agreement, or (c) solicit engagement by the entity for appraisal, assessment, reduction, condemnation representation, or other real estate services.

As to municipal, state and federal agencies, a Client shall be limited only to divisions, departments or agencies thereof within whom the Company has dealt with in the above described manner.

Client shall not include any Real Estate Developer. For purposes of this section 7.6, a "Real Estate Developer" shall be defined as a person or entity whose primary function or business is owning or operating real estate.

"Corporate Services Clients" is generally defined as Clients for whom services were performed for and who are occupants of space(s) either as owner or tenant, who have engaged the Company in projects consisting of more than a single transaction, be it sale, lease, acquisition, or management, which engagement usually results in multi-city assignments.

### 7.7.  *Survival of Terms.*

The provisions of this Article VII shall survive termination of this Agreement.

## ARTICLE VIII
## ASSIGNMENT OF INTERESTS

### 8.1.  *Restrictions on Transfer.*

No Member shall sell, assign, transfer, lease, license, give, bequeath, donate, pledge, encumber or otherwise dispose of ("Transfer"), whether voluntarily or involuntarily, directly or indirectly, by operation of law, in response to a bona fide offer from a third party other than a Member, or otherwise, any Membership Interest now or hereafter owned, beneficially or of record, by such Member, except as expressly provided in this Agreement. Any Transfer, or attempted Transfer, of a Membership Interest in violation of this Agreement shall be *void ab initio.*

### 8.2.  *Effect of Prohibited Transfer by Member.*

A Member's Membership Interest in the Company may not be transferred, in whole or in part, without the express written unanimous consent of the Members, unless the Member complies with the Transfer provisions contained in this Agreement. Any purported Transfer of Membership Interests prohibited by this Agreement shall be null and void and of no force or effect whatsoever; provided, that if the Company is required to recognize such a Transfer (or if the Company, in its sole discretion, elects to recognize such a Transfer), the Membership Interests transferred shall be strictly limited to the transferor Member's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interests may have to the Company. A transferee hereunder shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books and records of the Company, and shall not have any of the rights of a Managing Member or Member under the Act or this Agreement.

In the case of a Transfer or attempted Transfer of Membership Interests prohibited by this Agreement, the parties engaging or attempting to engage in such Transfer shall indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified persons may incur (including, without limitation, incremental tax

liability, attorney fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

8.3.   *Admission of Interest Holders as Members; Re-Classification.*

(a)      Subject to the other provisions of this Section 8.3, a transferee of Membership Interests may be admitted to the Company as a substituted Member, if the Transfer to the transferee was permitted under this Agreement and only upon satisfaction of the conditions set forth below:

(i)      The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Managing Member may reasonably request (including, without limitation, amendments to the Certificate) as may be necessary or appropriate to confirm such transferee as a Member of the Company and such transferee's agreement to be bound by the terms and conditions hereof;

(ii)      The transferee pays or reimburses the Company for all reasonable legal, accounting, filing, publication and other costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the transferred Membership Interests to the extent such reimbursement is requested by the Managing Member; and

(iii)      If the transferee is not an individual of legal majority, the transferee provides the Company with evidence satisfactory to counsel for the Company of the ability and authority of the transferee to become a Member and to be bound by and perform the terms and conditions of this Agreement.

(b)      Unless the transferee and the transferor are both already Class A Members, the Membership Interest received by any transferee shall be characterized or re-characterized as a Class B Membership Interest in the Company.  If the transferee is a Class B Member or a Person not previously a Member of the Company, such transferee shall only receive Class B Membership Interests in the Company regardless of the class status of the transferor Member's Membership Interest.

8.4.   *Capital Account of Transferee.*

Upon the valid Transfer of a Membership Interest, the transferee shall succeed to the corresponding portion of the Capital Account of the transferor Member.

8.5.   *Voluntary Transfer.*

(a)      *Procedure for Voluntary Transfer.*  If a Member shall give written notice (the "Offering Notice") to the Company and all of the Members of such Member's desire to Transfer all or any portion of his, her or its Membership Interest to a particular transferee (the "Proposed Transferee"), and such Offering Notice shall set forth the percentage Membership Interest proposed to be transferred and the terms and conditions of the proposed Transfer to the Proposed Transferee, including the price and including a true and correct copy of any offer made by the Proposed Transferee, then a buy-out event shall occur with respect to such Member's

Membership Interest at such time as the Company and all of the Managing Members shall have actually received the Offering Notice.

(b)      *Option of the Company*.  The Company shall have the first option to purchase all or a portion of the offered Membership Interests at the price, and upon the terms, set forth in the Offering Notice.  The Company shall exercise its option by giving notice to the Members within a period of thirty (30) days after receipt of the Offering Notice of its acceptance of the Offering Notice as to all or a portion of the selling Member's Membership Interest.  The selling Member shall not participate in any way in the Company's decision to accept (and to what extent) or reject such option.

(c)      *Option of the Manager-Designated Group*.

(i)      Within thirty (30) days after receiving a Member's Offering Notice, the Managing Member of the Company shall, in his, her or its sole discretion, determine the Persons entitled to purchase the offered Membership Interests (hereinafter the "Manager-Designated Group") and the amount of offered Membership Interests eligible to be purchased by each such Person (hereinafter the "Interest Amount").  The Managing Member may include any non-selling Member or any other third party deemed appropriate by the Managing Member in the Manager-Designated Group.  The Managing Member shall give notice of his, her or its determinations under this Section 8.5 (hereinafter the "Manager Notice") to all of the Members (including the selling Member) within such thirty (30) day period.

(ii)      If the Company does not purchase all of the Membership Interests offered in the Offering Notice, then each member of the Manager-Designated Group may (but need not) purchase all or a portion of his, her or its Interest Amount at the price, and upon the terms, set forth in the Offering Notice.  This option to purchase may be exercised by a member of the Manager-Designated Group by giving notice to all other members of the Manager-Designated Group, all Initial Members, and the Company within thirty (30) days of receiving the Manager Notice.  Such notice must specify the percentage of Membership Interests to be purchased.  If any one or more members of the Manager-Designated Group does not elect or elects only in part within the applicable time period to purchase his, her or its Interest Amount, then the other members of the Manager-Designated Group (hereinafter the "Remaining Members") may elect, by notice to all other members of the Manager-Designated Group, the Initial Members and the Company (including the selling Member) within an additional period of seven (7) days, to purchase all or any portion of the balance of the offered Membership Interests, in the same proportion that their individual Membership Interest bears to the aggregate Interest Amounts of all Remaining Members.  To the extent that fractional Membership Interests are created by the foregoing allocation, the number of Membership Interests that each member of the Manager-Designated Group shall have the right to purchase shall be rounded to the nearest thousandth of a Membership Interest.

(d)      *Sale to Proposed Transferee*.  In the event that all such offered Membership Interest is not purchased by the Company in the manner set forth in paragraph 8.5(b) or by the members of the Manager-Designated Group in the manner set forth in paragraph 8.5(c), then such Membership Interest may be transferred to the Proposed Transferee strictly in accordance with the terms and conditions of the Offering Notice.  In the event the selling

Member fails to so Transfer such Membership Interest to the Proposed Transferee within one hundred twenty (120) days after the Company receives notice of the offer, such Member's right to Transfer such Membership Interest shall automatically terminate, and such Member may not thereafter Transfer such Membership Interest without providing a new Offering Notice to the Company and to all of the Members in accordance with the terms of this Agreement.

8.6.   _Put Option._

(a)   _Procedure for Exercise of Put Option._  Each Member shall have the right (a "Put Option") at any time and from time to time after the date hereof to offer all or any portion of his, her or its Membership Interest for sale.  A Member shall exercise the Put Option under this Section 8.6 by giving notice to the Company and the other Members (a "Put Notice"), which specifies the percentage of Membership Interests that such Member desires to have purchased pursuant to this Section 8.6.  If a Put Notice is given prior to June 30 of any calendar year, Transfers pursuant to such Put Notice will be effective no later than the close of business on the December 31st next following the Put Notice.  The effective date of the Transfer shall be determined by the Managing Member.

(b)   _Option of the Company._  The Company may (but need not) purchase all or a portion of the offered Membership Interest at the price and upon the terms set forth in Section 8.7 of this Agreement.  The Company shall exercise the option by giving notice to the Members within a period of thirty (30) days after receipt of the Put Notice of its acceptance of the selling Member's offer as to all or a portion of the selling Member's Membership Interest.  The selling Member shall not participate in any way in the Company's decision to accept (and to what extent) or reject the offer.

(c)   _Option to the Manager-Designated Group._

(i)   Within thirty (30) days after receiving a Member's Put Notice, the Managing Member of the Company shall, in his, her or its sole discretion, determine the Persons to be included in the Manager-Designated Group and the Interest Amount of each such Person.  The Managing Member shall give the Manager Notice to all Members (including the selling Member) within such thirty (30) day period.

(ii)   If the Company does not purchase all of the Membership Interests covered by the Put Notice, then each member of the Manager-Designated Group may (but need not) purchase all or a portion of his, her or its Interest Amount at the price and upon the terms provided in Section 8.7 of this Agreement.  This option to purchase may be exercised by a member of the Manager-Designated Group by giving notice to all other members of the Manager-Designated Group, all Members, and the Company within thirty (30) days of receiving the Manager Notice.  Such notice must specify the percentage of Membership Interests to be purchased.  If any one or more members of the Manager-Designated Group does not elect or elects only in part within the applicable time period to purchase his, her or its Interest Amount, the Remaining Members may elect, by notice to all other members of the Manager-Designated Group, the Members and the Company (including the selling Member) within an additional period of seven (7) days, to purchase all or any portion of the balance of the offered Membership Interests, in the same proportion that their individual Membership Interests bears to the aggregate

Interest Amounts of all Remaining Members.  To the extent that fractional Membership Interests are created by the foregoing allocation, the number of Membership Interests that each member of the Manager-Designated Group shall have the right to purchase shall be rounded to the nearest thousandth of a Membership Interest.

      *(d)*    *Unpurchased Interests*.  If any Membership Interests covered by the Put Notice are not purchased by the Company in the manner set forth in paragraph 8.6(b), or by the members of the Manager-Designated Group in the manner set forth in paragraph 8.6(c), then the Company must purchase all such remaining Membership Interests.

      *(e)*    *Limitation of Put Option of Class B Members*.  Notwithstanding anything in this Section 8.6 to the contrary, no Class B Member shall have the right to exercise his, her or its Put Option if during the current calendar year Class A Members and/or Class B Members holding in the aggregate ten percent (10%) of the Class A and B Membership Interests previously exercised their Put Options.

### 8.7.    *Purchase Price and Terms.*

      *(a)*    *Purchase Price*.

      Upon the sale of any Class A Membership Interest pursuant to Section 8.6 of this Agreement, the selling Class A Member shall choose between two valuation methods, to determine the purchase price of such selling Class A Member's Membership Interest, as described in subsections (i) and (ii) below.  Such election shall be made thirty (30) days prior to the effective date of the sale of any Class A Membership Interest, and the purchaser thereof shall be notified of the election by the selling Class A Member in writing prior to the expiration of such thirty (30) day election period.  Upon the sale of any Class B Membership Interest pursuant to Section 8.6 of this Agreement, the purchase price of such Class B Membership Interest shall be determined in accordance with subsection (ii) below.

      (i)    *Option 1*:  The purchase price and terms of the sale shall be determined in accordance with the formula set forth in Schedule C attached hereto.

      (ii)    *Option 2*:  The purchase price shall be determined by computing the average Net Operating Income of the Company for the four (4) years immediately preceding the transfer of the Membership Interest being sold, multiplied by four (4).  See Schedule D for an illustration of the calculation of the purchase price of a one percent Membership Interest using this valuation formula.  The terms of a sale under this option shall be as set forth in Section 8.7(b) of this Agreement.

      The purchase price of each Membership Interest shall be equal to the product of the sum calculated in accordance with either Section 8.7(a)(i) or 8.7(a)(ii) multiplied by the percentage of Membership Interests being transferred (the "Purchase Price").

      *(b)*    *Payment Terms*.

(i)      Closing on the purchase of the selling Member's Membership Interest shall be held within ninety (90) days of the effective date of the Transfer (the "Closing Date").

(ii)      Payment for all Membership Interests purchased pursuant to this Agreement shall be on payment terms mutually agreed to in writing by the selling Member and the purchaser thereof, provided that such agreement shall be subject to the prior written consent of the Company's lender(s) under its credit or loan facilities if such consent is required by the terms of the documents evidencing such credit or loan facilities. For closings occurring after December 31, 2011, in the absence of an agreement otherwise, the Purchase Price shall be paid in full at closing.

(iii)      For closings occurring before January 1, 2012, in the absence of an agreement under Section 8.7(b)(ii), and subject to the terms of Section 8.7(c), when the Purchase Price has been determined in accordance with Section 8.7(aa)(ii) of this Agreement, the Purchase Price paid to a selling Member in connection with any purchase of Membership Interests hereunder shall be payable on the Closing Date in cash or by certified or bank cashier's check in a single payment. Alternatively, at the option of the purchaser, twenty percent (20%) of the Purchase Price (the "Downpayment") shall be paid on the Closing Date in cash or by certified or bank cashier's check, and the balance shall be payable in forty-eight (48) equal, consecutive, monthly installments, with interest thereon at the "prime rate" announced from time to time by Wells Fargo Bank, adjusted no more often than annually on the anniversary of the first payment hereunder, with such installment payments commencing on the first day of the second (2nd) month following the Closing Date. In the event that the Purchase Price had been determined in accordance with Section 8.7(a)(ii) of this Agreement, the amounts and time of the payments of the Purchase Price shall be as set forth in Schedule C attached hereto. The obligation to pay the balance of the Purchase Price shall be secured by a pledge of the Membership Interests acquired by the purchaser thereof and other security, if required by the selling Member. In the event that the purchaser is an individual, the note evidencing the obligation to pay the balance of the Purchase Price shall be executed by the purchaser and such purchaser's spouse, if such purchaser is married.

(c)      *The EBITDA Limitation*. The aggregate of all Purchase Price payments(other than any Downpayments) to be made by the Company in any calendar year shall not exceed thirty percent (30%) of the Company's EBITDA (earnings before interest, taxes, depreciation and amortization) for the Company's immediately prior fiscal year (the "EBITDA Limitation"). The Company's EBITDA shall be calculated each year by the Company's accountant, and the calculation of the Company's EBITDA by the Company's accountant shall be final and binding. If, in a particular year, the aggregate of all Purchase Price payments that the Company is committed to make in accordance with Section 8.7(b) will exceed the EBITDA Limitation, then the amount payable to each selling Member shall be reduced on a proportionate basis. Any shortfalls in the payment of the Purchase Price to selling Members as a result of the EBITDA Limitation shall be made up in successive years as quickly as possible by increasing the monthly installments of Purchase Price up to the amount permitted under the EBITDA Limitation. Such increases shall be allocated to all selling Members in proportion to their unpaid Purchase Price balance. Any payments of Purchase Price not made up as a result of the application of the EBITDA Limitation shall be added to the end of the payment term described

above and the payment term shall be extended accordingly. The EBITDA Limitation described in this subparagraph shall only apply to Membership Interests acquired by Members after December 31, 2008.

### 8.8.  *Control Offer.*

Notwithstanding anything in this Agreement to the contrary, if the Managing Member receives and desires to accept an offer to purchase or otherwise acquire all of the Membership Interests of the Company in a single transaction or series of related transactions, from a Person who is not a Member or an Affiliate of a Member (a "Control Offer"), every Member shall be required to Transfer their Membership Interest pursuant to the terms of the Control Offer.

### 8.9.  *Death.*

Upon the death of a Member, the Member's estate shall, within thirty (30) days after the appointment of the deceased Member's personal representative or forty-five (45) days after such deceased Member's date of death, whichever is earlier, offer to sell to the Company and to the members of the Manager-Designated Group, as determined in accordance with and in the manner set forth in Section 8.5 of this Agreement (unless they otherwise agree among themselves), all of such deceased Member's Membership Interest at the Purchase Price and on the terms set forth in Section 8.7 of this Agreement; provided, however, that if the Company shall have received life insurance proceeds with respect to the deceased Member, such life insurance proceeds shall be paid to the holder of the deceased Member's Membership Interest as quickly as possible (but in any event no later than five (5) months after the deceased Member's date of death). Such amount will be applied to the Purchase Price on the Closing Date.

### 8.10.  *Permanent Disability.*

Upon the Permanent Disability of a Member ("Permanently Disabled Member"), the Company and/or the members of the Manager-Designated Group, as determined in accordance with and in the manner set forth in Section 8.5 of this Agreement, shall purchase all of such Permanently Disabled Member's Interest at the Purchase Price and on the terms set forth in Section 8.7 of this Agreement.

### 8.11.  *Mandatory Offers.*

Upon the occurrence of any of the following events, the affected Member, shall be deemed to have made an offer to sell all, but not less than all, of his, her or its Membership Interest to the Company and the members of the Manager-Designated Group, and the Company and the members of the Manager-Designated Group all have the option, exercisable in their sole discretion, to purchase such Membership Interest, and the provisions of Sections 8.6 and 8.7 shall apply:

     *(a)*    *Bankruptcy.* A Member becomes Bankrupt; or

LLC Agreement 7.1.10 (2)-v7

(b)     *Felony Conviction*.  The conviction of a Member or a *nolo contendere* plea by a Member to a felony charge or a charge involving moral turpitude or an activity directly against the Company or another Member; or

(c)     *Real Estate License Suspended or Revoked*.  The revocation or suspension for more than one (1) year of any Member's license necessary to perform the obligations, responsibilities and duties which such Member performs for the Company if the Managing Member determines that such Member's ability to perform his, her or its responsibilities or duties is thereby materially impaired; or

(d)     *Termination of Services*.  The termination for any reason of any Member's services to the Company or any Member's material breach of his, her or its independent contractor agreement with the Company; or

(e)     *Dissolution*.  In the case of a Member who is a business entity, the dissolution and commencement of winding up of the Member; or

(f)     *Expulsion*.  The expulsion of a Member prior to the termination of this Agreement or the dissolution of the Company, which may be effected only by the affirmative vote of ninety percent (90%) of the Initial Members, if any, or if none, the Members, in either case other than the Member subject to expulsion, and upon a finding that the Member has materially breached this Agreement, or has engaged in conduct, in connection with the business of the Company or otherwise, which is materially detrimental to its interests or is grounds for conviction of a felony or a crime involving moral turpitude.

## ARTICLE IX
## TERM, DISSOLUTION, LIQUIDATION AND TERMINATION

9.1.    *Dissolution*.

The Company shall terminate and be dissolved upon the occurrence of any of the following events:

(a)     The unanimous consent in writing of the Initial Members;

(b)     Written notice of termination by the Managing Member delivered to each of the Members;

(c)     The death, retirement, withdrawal, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company, unless there is at least one remaining Initial Member and the business of the Company is continued by the affirmative vote of any of the remaining Initial Members within ninety (90) days of the event terminating the continued membership of such Member;

(d)     The sale or transfer of substantially all of the assets of the Company;

(e)     The Company ceases its business activity;

(f)     The Company becomes Bankrupt; or

(g)     The occurrence of any other event which under the Act causes the dissolution of a limited liability company.

### 9.2.   *Liquidation and Termination.*

Upon dissolution of the Company, the Company's business shall be wound up and the Initial Members, or their successors, or their designee(s), which such designee(s) shall be appointed in writing and shall have full authority to wind up the affairs of the Company and make a final distribution as provided herein (the "Liquidator"), shall liquidate the assets of the Company. The Liquidator shall continue to operate the Company with all of the power and authority of the Members. The Liquidator shall take the following action:

(a)     As promptly as possible after dissolution and again after final liquidation, the Liquidator, if requested by any Member, shall cause a proper accounting to be made by the Company's accountant of the Company's assets, liabilities and operations through the last day of the month in which the dissolution occurs or the final liquidation is completed, as appropriate.

(b)     After making payment or provision for all debts and liabilities of the Company, the Liquidator shall sell all properties and assets of the Company for cash as promptly as is consistent with obtaining the best price therefor. All gain, loss and amount realized on such sales shall be allocated to the Members as provided in this Agreement, and the Capital Accounts of the Members shall be adjusted accordingly.

(c)     Except as expressly provided herein, the Liquidator shall comply with any applicable requirement of the Act and all other applicable laws pertaining to the winding up of the affairs of the Company and the final distribution of its assets. Every reasonable effort shall be made to dispose of the assets so that the liquidating distributions to the Members shall be made in cash. If any non-cash assets must be distributed in kind, the Liquidator shall ascertain the fair market value by appraisal or other reasonable means of such assets remaining unsold, and each Member's Capital Account shall be charged or credited, as the case may be, as if such assets had been sold at such fair market value and the net gain or net loss realized thereby had been allocated to and among the Members in accordance with Article IV. All of the assets of the Company, including, without limitation, all cash and property, if any, then on hand in the Company, shall be applied and distributed, with reference to the fair market value thereof, by the Liquidator. A reasonable time shall be allowed for the orderly liquidation of the assets and the discharge of liabilities to creditors so as to minimize any losses attendant upon a liquidation of the Company.

(d)     The Company may distribute one or more of the Company's assets in kind to the Members. It is the intent of the Members that the distribution of assets to and among the Members pursuant to this Section 9.2(d) be identical in amount to that which would have occurred had such distribution been made in accordance with the respective positive Capital Account balances of the Members, following the adjustment of such Capital Accounts for (i) the

LLC Agreement 7.1.10 (2)-v7

Members' prior contributions, distributions, allocations of income, gain, loss and deduction (including allocations of any hypothetical gain or loss attributable to Company property previously distributed in kind to the Members), and any other adjustments required by Code Section 704(b) and the Treasury Regulations thereunder, and (ii) any allocations of gain or loss (including allocations of any hypothetical gain or loss attributed to the Company assets that will be distributed in kind to the Members) required to be made in connection with the dissolution and liquidation of the Company but prior to the distribution contemplated by this Section. In the event that the amount that would be distributable to and among the Members pursuant to the first sentence of this Section 9.2(d) differs from the amount that would have been distributable pursuant to the immediately preceding sentence hereof, income and/or loss shall be allocated to and among those Members with respect to whom any such disparity exists to the least extent necessary to cause the amount such Members would receive upon a liquidating distribution in accordance with positive balances in their respective Capital Accounts, as adjusted pursuant to this sentence, to equal the amount such Members receive as a liquidating distribution pursuant to the first sentence of this Section.

      *(e)*     Notwithstanding any provision of this Agreement to the contrary, no Member shall be obligated to restore a deficit balance in his, her or its Capital Account at any time.

      *(f)*     The distribution of cash and/or property to the Members in accordance with the provisions of this Section 9.2 and Section 9.3 below shall constitute a complete return to the Members of their Capital Contributions and a complete distribution to the Members of their Membership Interests in the Company and all Company property.

      *(g)*     Any Member shall have the right to acquire the assets of the Company at their Fair Value. The determination of "Fair Value" for purposes of this Section 9.2 shall be made, within sixty (60) days after the date of termination by a majority of the votes of the Members, as of the date of termination or, in the absence of agreement thereupon within such period, by a Person or firm regularly engaged in the conduct of business valuations in the principal markets served by the Company selected by a majority of the votes of the Members and paid for by the Company. In the event of a dissolution following a sale to a third party, Fair Value shall be the market value of the net sale proceeds and remaining assets, if any.

**9.3.**    *Order of Dissolution.*

      In settling accounts after the dissolution of the Company, the assets of the Company shall be distributed as expeditiously as possible in the following order not later than the end of the taxable year of the liquidation (i.e., the date upon which the Company ceases to be a going concern as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(g) or, if later, within ninety (90) days after the date of such liquidation):

      *(a)*     to creditors, including a Member to the extent of any unpaid expenses or any outstanding loan or advance;

      *(b)*     to the payment of the costs of winding up the affairs of, liquidating and dissolving the Company, including, without limitation, expenses of selling assets of the

Company, discharging the liabilities of the Company, distributing the assets of the Company and terminating the Company as a limited liability company in accordance with Section 9.2 hereof;

        *(c)*     to the establishment of reasonable reserves to provide for obligations to creditors;

        *(d)*     to the Members in accordance with their positive Capital Account balances; and then

        *(e)*     to the Members in accordance with their percentage Membership Interests.

    9.4.   *Protected Parties.*

Unless otherwise sold, upon the termination or liquidation of the Company, the Initial Members will be awarded exclusive rights to the Clients of the Company.

## ARTICLE X
## GENERAL PROVISIONS

    10.1.   *Offset.*

Whenever the Company is to pay any sum to any Member, any amounts which that Member owes to the Company may be deducted from that sum before payment.

    10.2.   *Notices.*

Except as expressly set forth to the contrary in this Agreement, all notices provided for or permitted to be given under this Agreement must be in writing. All such notices shall be either: (i) hand-delivered; (ii) delivered by facsimile transmission followed by prompt regular United States postal delivery; (iii) delivered by recognized overnight delivery service; or (iv) delivered by certified mail, return receipt requested or other similar postal service. A notice shall be deemed received upon actual delivery to a responsible adult at the required address or upon the successful confirmation of facsimile transmission, as the case may be. All notices to be sent to a Member must be sent to or made at the addresses given for that Member on <u>Schedule B</u> attached hereto.

    10.3.   *Entire Agreement.*

This Agreement constitutes the entire agreement of the Members relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

    10.4.   *Effect of Waiver or Consent.*

A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of his, her or its obligations with respect to the Company or a Member is not a consent or waiver to or of any other breach or default in the

performance by that Person of the same or any other obligations of that Person with respect to the Company or a Member. Failure on the part of a Person to declare any Person in default, irrespective of how long that failure continues, does not constitute a waiver by that Person of his, her or its rights with respect to that default until the applicable statute-of-limitations period has run.

### 10.5. *Amendment or Modification.*

This Agreement may be amended or modified from time to time only by a written instrument adopted by a majority of the votes of the Members; provided, however, that an amendment or modification reducing a Member's Membership Interest is effective only with that Member's consent.

### 10.6. *Binding Act.*

Subject to the restrictions on Transfer set forth in this Agreement, this Agreement is binding upon and inures to the benefit of the Members and their respective heirs, personal representatives, successors, and assigns.

### 10.7. *Governing Law; Severability.*

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, excluding any conflict-of-laws rules. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement, and the application of that provision to any other Person or circumstance, is not affected thereby and that provision shall be enforced to the fullest extent permitted by law.

### 10.8. *Further Assurances.*

In connection with this Agreement, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement.

### 10.9. *No Third Party Benefit.*

The provisions hereof are solely for the benefit of the Company and its Members and are not intended to, and shall not be construed to, confer a right or benefit on any creditor of the Company or any other Person.

### 10.10. *Waiver of Certain Rights.*

Each Member, other than the Initial Members, irrevocably waives any right such Member may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

### 10.11. *Counterparts.*

This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

### 10.12. *Arbitration.*

Any controversy or claim arising out of or related to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the then current rules for commercial arbitration of the American Arbitration Association in Philadelphia, Pennsylvania. Arbitration shall be by a panel of three (3) qualified arbitrators experienced in the matters at issue. Each party to the dispute shall choose one (1) arbitrator and the third arbitrator shall be chosen by the two arbitrators so chosen by the parties. If a party fails to choose an arbitrator within thirty (30) days after notice of commencement of arbitration or if the two (2) arbitrators fail to choose a third arbitrator within thirty (30) days after their appointment, the American Arbitration Association shall, upon the request of any party to the dispute, appoint the arbitrator or arbitrators to constitute or complete the panel as the case may be. Arbitration proceedings may be initiated by a party by making a written request to the American Arbitration Association, together with payment of any filing fee, at the office of the American Arbitration Association in Philadelphia, Pennsylvania. The award or determination by the arbitrators shall be final and binding and judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction. All costs and expenses incurred in connection with any such arbitration proceeding (including reasonable attorneys' fees) shall be borne by the non-prevailing party, or, if no decision is rendered, such costs and expenses shall be borne equally by the parties to the arbitration. If the arbitrators' decision is a compromise, the determination of which party or parties shall bear the costs and expenses of the arbitration proceedings shall be made by the arbitrators on the basis of the arbitrators' assessment of the relative merits of the parties' positions. Each party hereto consents to the personal jurisdiction of any court of competent jurisdiction in Philadelphia County, Pennsylvania for the purpose of enforcing this Agreement and any arbitration award rendered pursuant hereto and to the receipt of service of process in any such action in the manner set forth in this Agreement for the giving of notices.

### 10.13. *Specific Performance.*

Since the Membership Interests are unique in character, the parties will be irreparably damaged if this Agreement is not specifically enforced. Should any dispute arise concerning the Transfer of any Membership Interest, an injunction may be issued, by any court having jurisdiction, restraining any Transfer pending the determination of such controversy. In the event of any controversy concerning the right or obligation to purchase or sell any Membership Interests, such right or obligation shall be enforceable by a decree of specific performance. Such remedy shall, however, be cumulative and not exclusive, and shall be in addition to any other remedy which the parties may have, and shall be in furtherance and not in limitation of the obligation to arbitrate disputes under Section 10.12 hereof.

10.14. _No Partition_.

The Members agree that any property or properties now or hereafter owned by the Company are not and will not be suitable for partition.  Accordingly, each of the Members hereby irrevocably waives any and all rights that Member may have to maintain any action for partition of any Company property.

10.15. _Headings and Captions_.

The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, or extend the scope or intent of this Agreement or any provisions hereof.

[This space left intentionally blank]

LLC Agreement 7.1.10 (2)-v7

**IN WITNESS WHEREOF**, each Member has duly executed this Agreement on and as of the date set forth beside the Member's name below.

LANARD & AXILBUND, INC.

Dated: _7/30/30_

By: _____
   Douglas R. Sayer, President

Dated: _2/30/70_

_____
Douglas R. Sayer

Dated: _7/30/10_

_____
Robert B. Steinhart

LLC Agreement 7 1.10 (2)-v7

<u>SCHEDULE A</u>
CAPITAL ACCOUNTS

| Name | Amount | Percentage |
|------|--------|------------|
| Lanard & Axilbund, Inc.<br>Class A Member | | 1.11 % |
| Douglas R. Sayer<br>Class A Member | | 54.94 % |
| Robert B. Steinhart<br>Class A Member | | 43.95 % |
| TOTAL: | | 100 % |

SCHEDULE B
MEMBERS' ADDRESSES

| NAME | ADDRESS |
|---|---|
| Lanard & Axilbund, Inc. | 100 Four Falls Corporate Center<br>Suite 106<br>West Conshohocken, PA  19428 |
| Douglas R. Sayer | 1260 Morris Avenue<br>Bryn Mawr, PA  19010 |
| Robert B. Steinhart | 1314 Flat Rock Road<br>Penn Valley, PA  19072 |

<u>SCHEDULE C</u>
OPTION 1:  PURCHASE PRICE CALCULATION

Under Option 1 of the Purchase Price calculation referred to in Section 8.7 hereof, the Purchase Price shall be calculated in a manner consistent with the attached agreement dated June 30, 1992 between Lanard & Axilbund, Inc., Douglas R. Sayer, Harold E. Sussman and Allan Grobman; provided, however, that the term "L&A" for the purposes of this Agreement shall mean the Company and the term "Membership Interest" shall be substituted for the term "Stock."

I

**JOINDER**
**TO**
**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**LANARD & AXILBUND, LLC**

      I, the undersigned, do hereby acknowledge that I have read the Amended and Restated Limited Liability Company Operating Agreement of Lanard & Axilbund, LLC ("Company"), as amended (the "Agreement"), and understand all of its terms.  As a Class B Member of the Company, I hereby agree to be bound by the terms of the Agreement.

      I am aware that by the Agreement's provisions I have agreed to sell my membership interest in the Company on the occurrence of certain events.  I hereby consent to any such sale, approve the provisions of the Agreement and agree that my membership interest is subject to the provisions of the Agreement.  I will take no action at any time to hinder the operation of the Agreement with respect to my membership interest.

      **IN WITNESS WHEREOF**, I have hereunto set my hand and seal this _____ day of December, 2010, intending it to be effective as of January 1, 2010.

_____
Jason Wolf

Wolf Joinder to AR LLC O-A of Lanard 1.1.10

2