IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LANARD & AXILBUND, LLC, d/b/a : <br> COLLIERS INTERNATIONAL, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> JASON M. WOLF and WOLF : <br> COMMERCIAL REAL ESTATE, : <br> : <br> Defendants. : | CIVIL ACTION <br><br> No. 14-0234 |

**McHugh, J.**                                                                                    September 23, 2014

## MEMORANDUM

This is a breach of contract dispute between a commercial real estate broker and the firm he represented.  The dispute arises out of an Independent Contractor Agreement executed in 1998 (the "1998 Agreement").  Defendants seek dismissal of the action under a later ownership agreement containing an arbitration clause, and have further moved to dismiss for improper venue.  Because I find this District appropriate and the 1998 Agreement controlling, Defendants' motion to dismiss is denied on both counts.

**I.    Background**

Plaintiff Lanard & Axilbund, LLC, d/b/a Colliers International ("Colliers"), is a commercial real estate firm headquartered in Philadelphia, Pennsylvania.  Defendant Jason Wolf is domiciled in Southern New Jersey, and acts as President and principal owner of Wolf Commercial Real Estate ("WCRE"), a New Jersey licensed commercial real estate brokerage serving Southern New Jersey and the Philadelphia region.

1

In 1998, Wolf entered into an Agreement with Lanard & Axilbund, Inc. ("L&A"), Colliers' predecessor, which dictated the terms of his commercial real estate work as an independent contractor and salesperson.[1]  In 2010, Wolf entered into an Operating Agreement (the "2010 Agreement") with Plaintiff granting him 2% ownership interest in the company.  The 2010 Agreement controlled all terms relating to Wolf's ownership interest in Colliers.  The 1998 Agreement still remained in full force and effect, and continued to govern Wolf's activities as a salesperson and broker.

Wolf terminated his association with Colliers effective January 27, 2012.  Sections 14 and 15 of the 1998 Agreement contain provisions that take effect upon termination.  Section 15, "Restrictive Covenants," addresses the disclosure of confidential information.  See § 15(b).  Section 15(c) prevents Wolf from soliciting any of Plaintiff's clients or influencing any existing employees or sales representatives to terminate their relationship with Plaintiff for two years.  Section 14(b) entitles Wolf to certain post termination commissions, which Plaintiff allegedly paid (totaling in excess of $100,000).  Finally, Wolf's violation of any of the terms and conditions of the 1998 Agreement would constitute a waiver of all of his rights to post termination commissions.  See § 14(d).

Plaintiff alleges that Wolf began to conduct commercial real estate business in February, 2012 on behalf of his own brokerage, WCRE.  Upon Wolf's resignation and formation of WCRE, Plaintiff demanded the return of all of its confidential information.  According to Plaintiff, despite repeated requests, Wolf failed to return Plaintiff's information and used those materials to solicit Plaintiff's clients in Philadelphia and Southern New Jersey.  Plaintiff further alleges that Wolf encouraged Evan Zweben, an employee of Plaintiff, to join WCRE.  Colliers

---

[1] Colliers is the successor in interest to L&A and has been assigned all rights and obligations relating to the 1998 Agreement.

claims to be aware of at least twenty instances over the past two years where Wolf has solicited business from its clients, thereby violating the restrictive covenants in the 1998 Agreement. Moreover, Plaintiff claims that WCRE intentionally interfered with Wolf's existing contractual relationship with Plaintiff because the company knew and understood the express terms of the restrictive covenants.

Plaintiff's complaint consists of three counts: (1) breach of contract against Wolf; (2) intentional interference in existing contractual relations directed solely at Defendant WCRE; and (3) injunctive relief against both Defendants preventing the solicitation of Colliers' clients for two years.  Plaintiff also seeks counsel fees under Section 14(d) of the 1998 Agreement.

Defendant has moved to dismiss the complaint for improper venue, or, alternatively, to refer to arbitration under the 2010 Agreement.

## II. Legal Analysis

### a. Venue

Defendants move pursuant to Fed. R. Civ. P. 12(b)(3)(B) to dismiss Plaintiff's amended complaint for improper venue.  In the case of a challenge to venue, the burden of persuasion rests with the defense.  Myers v. Am. Dental Ass'n, 695 F.2d 716, 724 (3d Cir. 1982).  Defendants here have exercised their option to submit an affidavit in support of their motion, and Plaintiff has responded in kind.  In resolving the issue, I am bound to accept uncontradicted allegations in the complaint as true, and to resolve and construe disputed facts in favor of the Plaintiff. Carteret Savings Bank v. Shushan, 954 F.2d 141,142, n.1 (3d Cir 1992); Heft v. AA1 Corp., 355 F. Supp. 2d 757, 762 (M.D. Pa. 2005); see also Hancock v. Am. Tel. & Tel. Co., 701 F.3d 1248, 1260-61 (10th Cir. 2012), cert. denied, 133 S. Ct. 2009 (2013).

Under 28 U.S.C. § 1391(b)(2), a civil action may be brought "in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Based on the parties' submissions, I have no hesitancy in finding venue proper here. Neither Defendant challenges the Court's personal jurisdiction, which is telling. Wolf's Declaration does not address many fundamental points, including Colliers' allegation that the agreement which is the subject of this case was negotiated and signed in Pennsylvania. Wolf states that his sales "market" and "territory" were Southern New Jersey, but has not contested Colliers' allegation that he conducted business in Pennsylvania. Moreover, one of the pillars of Plaintiff's case is the solicitation of clients here in Pennsylvania in violation of the parties' agreement, and Wolf's Declaration is silent in that respect. Finally, WCRE's internet "home page" and its LinkedIn "Profile" page describe it as serving the Philadelphia region.

The requirement of substantiality in section 1391 is "intended to preserve the element of fairness so that a Defendant is not haled into a remote district having no real relationship to the dispute." Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994). As Defendant Wolf resides and works nearby in southern New Jersey, and purports to offer his services to the Philadelphia region, the Eastern District is hardly remote. This point is underscored by the fact that Defendants suggest the District of New Jersey could more appropriately hear the case. The federal Courthouse in Camden, New Jersey, is a mere ten minute drive from this District's Courthouse.[2] In fact, two federal Courthouses located in the District of New Jersey are substantially farther from where Wolf lives and works than the Philadelphia Courthouse. Finally, and most ironically, the arbitration clause that Defendants alternatively seek to enforce would require arbitration to take place in Philadelphia.

---

[2] Reed v. Weeks Marine, Inc., 166 F. Supp. 2d 1052, 1058 (E.D. Pa. 2001) ("[T]he District of New Jersey is literally across the Delaware River from the Eastern District of Pennsylvania and hence this Courthouse is no more inconvenient for the Defendant and its witnesses than is the Courthouse in Camden, NJ.").

As Defendants failed to carry their burden of establishing that venue is improper, I must deny their Fed. R. Civ. P. 12(b)(3)(B) motion to dismiss.

### b.  Arbitration

Based on the terms of the 2010 Agreement, Defendants further argue that this action should be dismissed in favor of arbitration. They cite a litany of case law regarding the Federal Arbitration Act (FAA) and corresponding federal policy favoring arbitration. E.g., Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1 (1983). This embrace of policy overlooks the fundamental issue. As recognized by the Court of Appeals, "the Supreme Court has repeatedly warned against overreading its precedent concerning the presumption of arbitrability. . . . [The presumption] applies only where an arbitration agreement is ambiguous about whether it covers the dispute at hand. Otherwise, the plain language of the contract controls." CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 172-73 (3d Cir. 2014). The Supreme Court has also observed that the FAA had a particular purpose: "As we have explained, this 'policy' is merely an acknowledgment of the FAA's commitment to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.'" Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 302 (2010). Thus, arbitration agreements are interpreted and enforced in the same manner as any other contract. The controlling question is whether the parties agreed to arbitrate *this* dispute.

Here, the 2010 ownership agreement indisputably contains a valid arbitration clause,[3] while the 1998 compensation agreement does not. Colliers, as the master of its complaint, has brought contract claims solely pursuant to the 1998 Agreement, which includes a number of terms relevant to competition, including non-solicitation covenants. Defendants now seek to

---

[3] § 10.12 of the 2010 Agreement reads: "Any controversy or claim arising out of or related to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the then current rules for commercial arbitration of the American Arbitration Association in Philadelphia, Pennsylvania."

merge the two agreements, arguing that an integration clause in the 2010 Agreement effectively renders the 1998 Agreement null and void based on the following language:

> This agreement constitutes the entire agreement of the Members relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

1998 Agreement at § 10.3.

However, mere "presence of an integration clause cannot invest a writing with any greater sanctity than the writing merits where . . . it assertedly does not fully express the essential elements of the parties' undertakings." Int'l Milling Co. v. Hachmeister, Inc., 380 Pa. 407, 417, 110 A.2d 186, 191 (1955).[4]  The critical question is whether the 2010 Agreement was meant to encompass the same issues that were addressed in the 1998 Agreement and supersede it. I conclude that it did not.

The 1998 Agreement provides for Wolf's duties, obligations, and compensation during the course of his employment as a Colliers salesperson. The scope of the 2010 Agreement is limited to Wolf's rights and obligations as a 2% owner of Colliers. This distinction in contractual terms is exemplified by the fact that the two agreements operated simultaneously from 2010 until Wolf's resignation in 2012. Most notably, Wolf received his compensation pursuant to the 1998 Agreement, which continued even beyond the date of his resignation, because of a contractual right to post-termination commissions. It strikes the Court as

---

[4] "The effect of an integration clause is to make the parol evidence rule particularly applicable." Hart v. Arnold, 884 A.2d 316, 341 (Pa. Super. Ct. 2005); Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments, 951 F.2d 1399, 1406, n.6 (3d Cir. 1991). Once an integration clause is in play, "a writing is determined to be the parties' entire contract," and the parol evidence rule applies, effectively barring the admissibility of other written or oral agreements "*involving the same subject matter . . . to explain or vary the terms of the contract*." Yocca v. Pittsburgh Steelers Sports, Inc., 578 Pa. 479, 498, 854 A.2d 425, 436-37 (2004) (analyzing an integration clause with the following language: "This Agreement contains the entire agreement . . . and shall supersede any representations or agreements previously made or entered into by the parties . . . ") (internal citations omitted) (emphasis added). However, an integration clause is not a talisman that operates magically to moot a separate agreement involving distinct subject matter, even if the signatories overlap.

incongruous with basic tenets of contract law for a party to contend that a contract is void, after consistently performing according to the terms and accepting the benefits that flow from it.

      Here, Wolf cannot suddenly disassociate from the 1998 Agreement because the terms are not favorable in this context.  If Wolf had stopped performing under the 1998 Agreement upon the execution of the 2010 Agreement, his argument might have had some persuasiveness based on the parties' conduct and the broad language of the integration clause, which pertains to "all prior contracts or agreements with respect to the Company."  1998 Agreement at § 10.3.  However, Wolf's conduct in continuing to perform and accept compensation pursuant to the 1998 agreement after the execution of the subsequent contract undercuts that position.

      This conclusion is consistent with Pennsylvania contract law.  Even if the 2010 Agreement had terminated the 1998 Agreement, "general principles of contract law teach us that when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby." Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am., 28 F.3d 347, 355-56 (3d Cir. 1994). Or, as Plaintiff correctly observes, even a "defrauded party can ratify the contract if 'it accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract.'" Retail Brand Alliance, Inc. v. Rockvale Outlet Ctr., LP, 2007 WL 403885, at *6 (E.D. Pa. Jan. 31, 2007). Wolf's conduct here meets the threshold of acquiescence in the continuing effect and enforceability of the 1998 Agreement.

Viewing the allegations in the light most favorable to Colliers, it seems clear that the two contracts operated concurrently for a significant period of time.  Had Plaintiff alleged violations of the 2010 Agreement, Defendants are correct that those claims would have to be stayed or dismissed in favor of arbitration.  However, Colliers did not bring suit based on the 2010 Agreement, but rather chose to center its case on Wolf's alleged breach of the 1998 Agreement—a choice that remains well within Plaintiff's purview.  Accordingly, the arbitration clause in the 2010 Agreement is not applicable to Plaintiff's claims.

Because I find the 1998 Agreement controls the underlying dispute, Defendants' motion to dismiss in favor of arbitration is denied.  An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Court Judge